2024 IL App (1st) 231670

No. 1-23-1670

Opinion filed April 26, 2024

Sixth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* Nr. R. and Nj. R., Minors | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| (The People of the State of Illinois, | ) | |
| | ) | Nos. 18 JA 00123; 18 JA 00626 |
| Petitioner-Appellee, | ) | |
| | ) | The Honorable |
| v. | ) | Lisa M. Taylor, |
| | ) | Judge, Presiding. |
| Paris M., | ) | |
| | ) | |
| Respondent | ) | |
| | ) | |
| (Deborah J. and Edward O., Intervenors-Appellants)). | ) | |

_____

JUSTICE C.A. WALKER delivered the judgment of the court, with opinion.
Presiding Justice Oden Johnson and Justice Hyman concurred in the judgment and opinion.

**OPINION**

¶ 1    Intervenors-Appellants Deborah J. and Edward O. were the foster parents to the subject minors, Nr. R. and Nj. R. During the minors' permanency hearing on August 3, 2023, the circuit court found their foster home placement was not necessary and appropriate to the permanency goal. The foster parents filed an emergency motion to intervene and stay the change of placement

and a motion to vacate the placement finding. The court allowed the foster parents to intervene but denied the stay and motion to vacate. The foster parents appealed, arguing (1) the circuit court deprived them of the right to be heard under section 1-5(2)(a) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-5(2)(a) (West 2022)) at the permanency hearing, (2) the court's placement finding was against the manifest weight of the evidence, and (3) the court's denial of the motion to stay the change of placement was an abuse of discretion. For the following reasons, we reverse the circuit court's denial of the motion to vacate and stay the change of placement, vacate the court's August 3 permanency finding, and remand for a new hearing with directions that the court must allow the foster parents to be heard.

¶ 2                                     I. BACKGROUND

¶ 3      On February 6, 2018, the State filed a petition for adjudication of wardship and motion for temporary custody alleging one-month-old Nr. R. was abused and neglected pursuant to the Act. A few months later, the State filed a petition for adjudication of wardship and motion for temporary custody alleging Nr. R.'s brother, three-year-old Nj. R., was abused and neglected pursuant to the Act. The petitions alleged that the minors' biological mother admitted leaving Nj. R. home alone. The mother had two other children that were not in her care. She had been diagnosed with bipolar disorder and schizophrenia and was not taking her psychiatric medications. N.R. Sr. and "All Whom It May Concern" were listed as the putative father. N.R. Sr. was deceased, and paternity had not been established. The court found probable cause that the minors were abused and neglected and placed them in the temporary custody of the Department of Children and Family Services (DCFS).

¶ 4    The minors were initially placed with their maternal aunt. On August 15, 2018, the minors were moved to the foster home of Deborah J. and Edward O. (collectively, foster parents). On January 18, 2019, the court adjudged Nr. R. and Nj. R. wards of the court and awarded guardianship to DCFS. The court entered a permanency goal of returning the minors home in 12 months and found their foster home placement necessary and appropriate.

¶ 5    The January 18, 2019, permanency order for Nr. R. stated he was one year old, lived with his brother, and received occupational and developmental therapy. The permanency order for Nj. R. stated he was four years old, lived with his brother, participated in individual therapy and "PCIT" and was referred to speech therapy and an evaluation for "CRT." The court entered a permanency goal of returning the minors home pending status hearing due to the biological mother not making substantial progress and found the minors' foster home placement was necessary and appropriate.

¶ 6    The April 2021 permanency orders for the minors stated they were in a loving foster home willing to provide permanency. The court entered a permanency goal of substitute care pending determination on termination of parental rights and found the minors' foster home placement was necessary and appropriate. In May 2022, the court continued its permanency goal of substitute care pending determination on termination of parental rights. The court also found that "determination needs to be made about whether the current home will provide permanency." In January 2023, the court continued its prior permanency goal and found "placement with [the foster mother] and [the foster father] is not necessary and appropriate."

¶ 7    On February 15, 2023, the State filed two petitions for the appointment of a guardian with the right to consent to adoption alleging that the minors' parents were unfit and requesting their

parental rights be permanently terminated. The petitions stated that the minors were "not in an appropriate pre-adoptive placement" and "[t]he agency is looking for an appropriate pre-adoptive home."

¶ 8    On March 14, 2023, counsel for the foster parents filed an appearance and a motion to be heard. The motion alleged that the foster parents had a right to be heard by the court pursuant to the Act. The motion further alleged that "[t]he foster parents are not seeking intervenor status at this time." The case proceeded to a hearing on the motion to be heard before Judge Maxwell Griffin. Counsel stated the foster parents were not seeking to intervene at that time and wanted to seek administrative remedies through DCFS. Judge Griffin denied counsel's appearance and the motion to be heard:

> "THE COURT: So with respect to that as you indicated you are not seeking intervention at this time. My policy—I am sorry, let me go back.
>
> As part of your order, as I read it, you want an order from the Court saying that the foster parents are allowed to be heard at those proceedings.
>
> So I am going to—technically you are seeking leave to file an appearance in this matter. I am going to deny that because you don't seek to make them a party to this case.
>
> I am also going to deny the motion for an order. I don't enter those orders as my policy is that foster parents can be present during hearings and they have a right to be heard. And I will ask them, before I make a decision, if they are present if they have any questions or if they have anything they want the Court to know.

So I will allow [the foster mother] and [the foster father] as to sustain the proceedings and before we leave, I will give them a chance to be heard. Although we are here for limited purposes."

¶ 9 The minors' guardian *ad litem* informed Judge Griffin that the foster parents "are aware that the agency is looking to remove the boys from their care" but had not received a written notice because the date of removal had not been identified. Judge Griffin then asked the foster parents if there was anything they would like to say to the court. The following colloquy occurred:

"[FOSTER MOTHER]: Yes, there is something that I would like to say. It would be a horrible decision to uproot the boys from their home they have had for five years and that [Nr. R.] has been here since he was 11 weeks old. They don't know any other home. They are happy in their home. We are happy with them. And we don't want them to leave and they don't want to leave either.

THE COURT: Foster Dad, do you have anything to say?

[FOSTER FATHER]: Yeah, I just wanted to add briefly to what my wife never said. We ask the Court to consider the effect not only on us, but on these children as she said they have been with us for five years.

When [Nj. R.] was placed with us he was only three and a half years old and this was his fifth home. This is the longest period of stability they have had in their lives. [Nr. R.] was only 11 weeks old and this is the only home and only family that he knows.

It doesn't take a lot of imagination to see what impact a removal would have upon them. And we would ask the Court to consider the impact on the children in its decision. Thank you."

¶ 10    Judge Griffin vacated the finding that the minors' current placement was not necessary and appropriate and "changed *sua sponte* by this Court to a deferred finding of whether placement was necessary and appropriate." He believed the prior finding may "eliminate or preclude certain assessment" and changed the finding so "the agency can move forward and the foster parents can move forward with all appropriate remedies, only to them." The guardian *ad litem* objected, and Judge Griffin stated that he was not changing the placement finding.

¶ 11    The case proceeded to a case management video conference before Judge Lisa Taylor on June 14, 2023. Counsel stated that the foster parents were appearing to seek the right to be heard and not to intervene in the matter. Judge Taylor reviewed the court notes and stated that Judge Griffin allowed counsel and the foster parents to be present and address the court during prior proceedings. Judge Taylor subsequently ordered that the foster parents' counsel will only be allowed to appear during any discovery proceedings and would not be allowed to participate in substantive matters unless the court granted leave to intervene.

¶ 12    Judge Taylor held a permanency hearing via Zoom on August 3, 2023. The foster parents and their counsel were present, and the State filed a motion to exclude all nonparties from the hearing because the case dealt with substantive matters. Judge Taylor granted the motion and placed the foster parents and their counsel in a virtual waiting room.

¶ 13    At the commencement of the hearing, the guardian *ad litem* submitted two exhibits into evidence: a court report prepared by Betty Hall, a caseworker at Children's Place Association, and a service plan dated February 1, 2023. The guardian *ad litem* also requested the court take judicial notice from two past court proceedings wherein Judge Griffin found the minors' placement was

not necessary and appropriate and later *sua sponte* changed his finding to a deferred finding on placement.

¶ 14 The caseworker's report detailed the following factual allegations. The minors were in a nonrelative foster home placement. During home visits, the caseworker found the home to be safe. At the time the case was transferred to Children's Place Association in April 2022, the foster parents were undecided about adopting the minors and were not willing to commit. The foster parents believed that the minors needed "a 'lot more services' " before they would agree to adopt them. A caseworker contacted the foster parents to inquire about the additional services. The foster parents could not identify the minors' specific needs but maintained that they had behavioral issues. Specifically, Nr. R. "ran and jumped a lot" and they were concerned about Nr. R.'s behavior at school because he was playing rough with the other children and not following directions. The foster father stated that Nj. R. was physically aggressive and hard to control when he was angry and that Nj. R. will be extremely difficult to deal with within a few years as the foster mother was 71 years old and the foster father was 78 years old. During her visits, the caseworker observed the minors playing in an age-appropriate manner.

¶ 15 The foster parents requested several services for the minors during the placement. They requested a neuropsychological evaluation for Nr. R. However, the minors' therapist did not believe Nr. R.'s behavior was severe enough to justify such evaluation. The foster parents were later advised to provide documentation from Nr. R.'s pediatrician, write-ups from his school, and a letter from his therapist to support their request but failed to do so. The foster parents also requested an attention-deficit/hyperactivity disorder (ADHD) assessment from Nr. R.'s pediatrician, and the pediatrician did not want to provide an assessment. They requested it again,

and the pediatrician gave the foster parents a questionnaire and prescribed Nr. R. Adderall after reviewing the assessment and speaking with them. The foster parents began taking Nr. R. to a new therapist upon the pediatrician's referral while still receiving therapy from his original therapist. They also obtained a psychiatrist for Nr. R. unbeknownst to the placement agency and despite the caseworker and therapist's discouragement. The foster mother informed the caseworker that Nr. R. needed a "CIPP meeting" because he was on medication, experiencing issues, and needed to be "stepped up" so they can get more money for his services. The caseworker informed the foster parents that Medicaid and DCFS would not pay for redundant services and expressed concern about the minors being overwhelmed by engaging with multiple therapists.

¶ 16    The foster mother informed the caseworker that she believed Nj. R. may inherit mental illness from his biological mother and that Nr. R. suffered trauma from when his father was killed while he was still in-utero. The caseworker discovered that the foster parents were not being truthful about some of their concerns regarding Nj. R.'s trauma and statements Nj. R. allegedly made about his father's death or memories of it. The caseworker recommended that the minors "need to achieve permanency in another foster home placement."

¶ 17    In addition to the information provided in the caseworker's report, the service plan provided that the caseworker discovered the foster parents were using a copy of the integrated assessment to ask for specialized care for the minors. The caseworker also discovered that Nj. R. may not have witnessed his father's death although the foster parents stated that Nj. R. shared details about it. The foster parents reported Nj. R. was suffering from post-traumatic stress disorder during the visits with his biological mother, and the agency suspended the visits. Nj. R. later expressed that he missed the visits with his biological mother and denied having feelings of sadness

or anger when he attended the visits. The minors were reportedly doing well in school, and their teachers had no concerns about their behavior. The service plan provided that the foster parents were not willing to adopt and the minors needed to be moved to a preadoptive placement.

¶ 18     The guardian *ad litem* then presented testimony from Hall. Hall stated she was assigned to the minors' case in April 2023. Since that time, Hall had concerns about the current foster home. Hall last visited the minors at their foster home on July 25, 2023. The foster mother was always present with the minors while Hall visited. When Hall asked the foster mother to leave the room, the foster mother went to a nearby room about eight feet away. Hall noticed that the minors stopped talking to her over time, and Nj. R. looked to the foster mother before he answered Hall's questions. On one occasion, Hall asked Nj. R. about summer camp, and he looked at the foster mother. Nj. R. and the foster mother kept looking at each other until the foster mother stated "why you looking at me. Ms. Hall is asking you a question." Nj. R. then looked at Hall and stated "well, I don't know what to say." Hall found this behavior concerning. Hall testified she had concerns about the foster mother's emotional and psychological abuse, not physical abuse.

¶ 19     Hall further testified that Nj. R. was diagnosed with ADHD and had documented trauma. Nj. R. attended play and behavior therapy at Howard Counseling and trauma therapy at Advocate Health Services and takes psychiatric medications. Nj. R. had an individualized education plan in school. He does "very well" in school, gets "very good" grades, and was the student of the month in December 2022. Nj. R.'s therapists informed Hall that the foster mother is present during the virtual sessions. Nj. R.'s play and behavioral therapist informed Hall that sometimes Nj R. plays out of camera view, and the foster parent will stay in the room to make sure he stays on the video. Hall asked the trauma therapist to excuse the foster parents from the room because "if he was under

duress or being coaxed as to what to say with his trauma there is no way he can ever talk to his therapists in confidence about that."

¶ 20    Nr. R. was diagnosed with ADHD and taking psychiatric medications. He was in group therapy with Howard Counseling. Nr. R. was doing "very well" in his preschool program, and his teacher spoke highly of him. Nr. R. was named student of the month again in January 2023.

¶ 21    Hall testified that the foster parents had not identified a backup provider if they adopted the minors. Hall's agency assessed the foster parents' adult daughter as a possible backup provider. The daughter expressed concerns about financially caring for the minors and did not know anything about the minors' special needs. DCFS was looking to remove the minors from their current foster home placement. Potential alternative placements included the minors' paternal grandmother or a specialized foster home. The minors' mother supports the placement of the minors with the parental grandmother and is willing to sign consents for the grandmother to adopt the minors. Hall was waiting to receive a waiver from DCFS to move the minors with the grandmother. A waiver was required before the minors moved in because the grandmother had four children under the age of 18 currently living in her home. Hall recommended a permanency goal of substitute care pending a determination on termination of parental rights because the mother had not completed all services and posed a "significant safety issue due to [her] mental health." The foster parents had not been issued a 14-day notice of a new placement.

¶ 22    The guardian *ad litem* argued that the current placement was not necessary and appropriate for the minors given the evidence presented at the hearing. She further explained that "the agency does continue to have great concerns about [the placement] and are moving as swiftly as possible to get the kids into a safe and appropriate long term placement." The State argued the current

placement was not necessary and appropriate for the minors. The assistant state's attorney asserted that "additional issues have cropped up every time that she testified or the agency has communication with me," and she was "extremely concerned about the current placement."

¶ 23    At the conclusion of the evidence and arguments, Judge Taylor noted the individuals present, including the foster parents and their counsel. Judge Taylor found that the appropriate goal for the minors is substitute care pending determination on termination of parental rights and that the evidence established the minors' placement is not necessary and appropriate to the permanency goal.

¶ 24    On August 15, 2023, the foster parents filed an emergency motion to intervene and stay the change of placement. The foster parents also filed a motion to vacate the August 3, 2023, order in which the circuit court found the minors' foster home placement was not necessary and appropriate to the permanency goal. The motion alleged that, on August 9, 2023, DCFS served the parents with a notice of change of placement providing that "[a] court order entered on 8/[3]/23 finding the placement not appropriate." The motion further alleged that the August 3 court order was entered "without the participation or knowledge of the Foster Parents" in violation of their right to be heard and the court's placement finding of not necessary and appropriate "eliminate[d] any opportunity for meaningful administrative appeal."

¶ 25    At the hearing, the parties first presented their arguments on the motion to intervene. Judge Taylor granted the motion, but stated, "I'm not vacating my August 3rd order." The guardian *ad litem* stated:

> "I would say that the one thing to keep it—to consider judge, is that during the August 3,
> 2023, permanency hearing, one thing your Honor might consider doing today is giving the

foster parents today a chance to fully express their concerns and thoughts on this situation. My—and thinking back, looking back at that hearing, they were not necessarily given a full opportunity to do that.

And so your Honor could listen to them and consider more fully what they say and decide if that changes your Honor's ruling for that hearing, and that way also it does— because the Juvenile Court Act gives foster parents a clear right to be heard. And so that is an important issue for if we ever went up on appeal, for the record. And so I think that that is something your Honor could do today."

¶ 26    The parties continued their arguments on the motions. At the end, Judge Taylor reiterated that she was allowing the foster parents to intervene and "limit it *** to the sole purpose of addressing the August 3rd, 2023, order and finding that the placement was not necessary and appropriate." Judge Taylor further held she was "not going to vacate the August 3rd, 2023, finding or order that the placement is not necessary and appropriate" and "not going to stay removal of the children from the home."

¶ 27    Judge Taylor then asked the foster mother if there was anything she would like to state on the record. The foster mother stated that she read DCFS's notice of change of placement and believed the allegations were untrue. The minors were safe in her home, and she did not request any unnecessary services for them. The minors had gone back to school, and it "would be very hurtful for them to take them away from what they are used to." The foster mother also stated, "So we have had [the minors] for a long time, and they—we have been in their lives, and they have been in our lives, and we have tried to make the best for them, the best." She did not want the minors to leave her home. The foster mother further explained that she and her husband wanted to

adopt the minors, but several mishaps occurred. The first document for adoption was printed over, and the second document incorrectly stated that the foster parents did not wish to adopt or obtain guardianship. The foster mother requested a third document but never received it. Judge Taylor thanked the foster parents and stated she had entered her orders. This appeal follows.

¶ 28                                    II. JURISDICTION

¶ 29    The circuit court entered a finding that the minors' foster home placement was not necessary and appropriate to the permanency goal on August 3, 2023. On August 15, the foster parents filed an emergency motion to intervene and stay the change of placement and motion to vacate the August 3 order. On August 23, the circuit court allowed the foster parents to intervene but denied the motion to vacate the August 3 order and stay the change of placement. The foster parents filed a notice of appeal on September 18, 2023. We have jurisdiction to review the propriety of the August 3 order, pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994). See *In re Faith B.*, 216 Ill. 2d 1 (2005) (finding a permanency order was final and appealable pursuant to Rule 301 when the goal did not remain open and subject to modification at the time the court entered the judgment). We also have jurisdiction to review the merits of the foster parents' request to stay the minors' change in placement pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 307(a)(1) (eff. Nov. 1, 2017). See *Lisk v. Lisk*, 2020 IL App (4th) 190364, ¶ 20 (a stay of proceedings is an injunction).

¶ 30                                    III. ANALYSIS

¶ 31    On appeal, the foster parents argue (1) they were deprived of the right to be heard pursuant to the Act at the August 3, 2023, permanency hearing, (2) the circuit court's foster home placement

finding was against the manifest weight of the evidence, and (3) the circuit court's denial of the motion to stay the change of placement was an abuse of discretion. We begin by assessing the foster parents' argument regarding the right to be heard at the permanency hearing.

¶ 32    The foster parents argue that they were deprived of the right to be heard under the Act because they were excluded from the August 3 permanency hearing, barred from addressing the court before it made its permanency finding, and denied the right to timely access the placement agency's administrative appeals process. The State responds that the foster parents' right to be heard was not violated because the right did not extend to being present at the hearing or being represented by counsel. The State further argues that, even if the foster parents' right to be heard was violated, their only remedy was to file a *mandamus* action, which they did not do. Where no facts are in question and the issue requires us to assess the proper interpretation of a statute, we review the circuit court's decision *de novo*. *People v. Bowden*, 313 Ill. App. 3d 666, 668 (2000).

¶ 33    Section 1-5 of the Act governs the rights of individuals at juvenile proceedings. 705 ILCS 405/1-5 (West 2022). As to the rights of foster parents, section 1-5(2)(a) provides:

"Though not appointed guardian or legal custodian or otherwise made a party to the proceeding, any current or previously appointed foster parent or relative caregiver, or representative of an agency or association interested in the minor has the right to be heard by the court, but does not thereby become a party to the proceeding.

In addition to the foregoing right to be heard by the court, any current foster parent or relative caregiver of a minor and the agency designated by the court or the Department of Children and Family Services as custodian of the minor who is alleged to be or has been adjudicated an abused or neglected minor under Section 2-3 or a dependent minor under

Section 2-4 of this Act has the right to and shall be given adequate notice at all stages of any hearing or proceeding under this Act.

Any foster parent or relative caregiver who is denied his or her right to be heard under this Section may bring a mandamus action under Article XIV of the Code of Civil Procedure against the court or any public agency to enforce that right. The mandamus action may be brought immediately upon the denial of those rights but in no event later than 30 days after the foster parent has been denied the right to be heard." *Id.* § 1-5(2)(a).

¶ 34 The Act does not define "right to be heard." This court found that foster parents were "heard" under section 1-5(2)(a) when the foster parents were provided with the opportunity to speak before the court and argue their motion to vacate (*In re C.H.*, 2018 IL App (3d) 180089, ¶ 11), when the foster parents were given the "opportunity to tell the court anything he or she wished and respondents each did so" (*In re M.P.*, 401 Ill. App. 3d 742, 746 (2010)), and when the foster parents were allowed to describe the general well-being of the minor or explain the minor's attachment to the foster family at the best interest hearing (*In re K.I.*, 2016 IL App (3d) 160010, ¶ 62). Based on the above, we believe foster parents are "heard" pursuant to the Act when the court allows them to address their concerns during the juvenile proceedings.

¶ 35 Considering this construction of "heard" here, the record shows the foster parents were not heard at the August 3 permanency hearing. Counsel for the foster parents filed a motion to be heard in March 2023. Judge Griffin denied the motion because it was his "policy [ ] that the foster parents can be present during hearings and they have a right to be heard. And I will ask them, before I make a decision, if they are present if they have any questions or if they have anything they want the Court to know." Judge Griffin then allowed the foster parents to speak before vacating his

finding that the minors' placement was not necessary and appropriate. Subsequently, the case went to a case management conference before Judge Taylor. Counsel reiterated that the foster parents were seeking the right to be heard in the matter. Judge Taylor reviewed the court notes and acknowledged that Judge Griffin had allowed the foster parents to address the court. At the start of the permanency hearing, Judge Taylor placed the foster parents and their counsel in a virtual waiting room and conducted the hearing in the foster parents' absence. At the conclusion of the evidence, Judge Taylor stated that the foster parents were present. Judge Taylor then made a finding that the minors' placement was not necessary and appropriate. The foster parents did not address the court before Judge Taylor entered the finding.

¶ 36    This failure to be heard was not remedied at the hearing on the motion to vacate filed 12 days later because Judge Taylor upheld the August 3 permanency order prior to allowing the foster parents to be heard on whether the minors' foster home placement was necessary and appropriate. The motion alleged that the foster parents were not given an opportunity to speak at the permanency hearing. Judge Taylor stated that she was not vacating her August 3rd order. The guardian *ad litem* then asked the court to consider giving the foster parents an opportunity to speak because "they were not necessarily given a full opportunity to do that." At the end of the parties' arguments, Judge Taylor reiterated that she was not vacating her August 3 finding and then allowed the foster parents to address the court. We note that at this point in the proceedings, Judge Taylor had already determined that the foster parents' comments would have no effect on the permanency finding and rendered the right to be heard ineffectual. Under these circumstances, we find that the foster parents were denied the right to be heard at the August 3 permanency hearing.

¶ 37     We disagree with the State's argument that the foster parents' only remedy was *mandamus* relief. Section 1-5 provides, "[a]ny foster parent or relative caregiver who is denied his or her right to be heard under this Section *may* bring a mandamus action under Article XIV of the Code of Civil Procedure." (Emphasis added.) 705 ILCS 405/1-5(2)(a) (West 2022). "Legislative use of the word 'may' is generally regarded as indicating a permissive or directory reading ***." *People v. Reed*, 177 Ill. 2d 389, 393 (1997). We read section 1-5(2)(a) as providing a *mandamus* action as an alternative, not mandatory, procedural avenue, and therefore, the foster parents were not required to raise their claim in a *mandamus* action.

¶ 38     We find the foster parents were deprived of the right to be heard under section 1-5(2)(a) of the Act at the August 3 permanency hearing. The circuit court repeatedly informed the foster parents that it was not going to consider their concerns about the best interest of the children. The foster parents' exposure to the court's persistent pressure denied their right to be meaningfully heard. Accordingly, we reverse the circuit court's denial of the motion to vacate and stay the change of placement, vacate the court's August 3 order, and remand for a new permanency hearing to determine the best interest of the children. Because we are vacating the August 3 order and remanding this case for a new hearing, we need not determine whether the denial of the stay was an abuse of discretion.

¶ 39                                    IV. CONCLUSION

¶ 40     We find the foster parents were deprived of the right to be heard under section 1-5(2)(a) of the Act at the August 3 permanency hearing. Therefore, we reverse the circuit court's denial of the motion to vacate and stay the change of placement, vacate the court's August 3 order, and remand

this case for a new permanency hearing to determine the best interest of the children. At the hearing, the circuit court must allow the foster parents to be heard.

¶ 41    Vacated and remanded with directions.

---

**_In re Nr. R._, 2024 IL App (1st) 231670**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 18-JA-00123, 18-JA-00626; the Hon. Lisa M. Taylor, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Charles A. Rohde, of Law Offices of Rohde & Infelise P.C., of Wheaton, for appellants. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham and Gina DiVito, Assistant State's Attorneys, of counsel), for the People. |
| | Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain, of counsel), guardian *ad litem*. |